IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 05-cv-02629-MSK-MJW

CHRISTOPHE McCRAY and
PENSAL McCRAY,

      Plaintiffs,

v.

EDWARD ANTHONY SMITH,
E. ANTHONY AND ASSOCIATES, LLC.,
THE EDIFUS GROUP, INC.,
WILLIAM BOWMAN, and,
FOR MORTGAGES.

      Defendants.

---

**RECOMMENDATION ON:
(1) PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT AS TO DEFENDANT
WILLIAM BOWMAN (DOCKET NO. 69);
(2) PLAINTIFFS' APPLICATION FOR DEFAULT JUDGMENT AGAINST DEFENDANT
WILLIAM BOWMAN (DOCKET NO. 98);
AND
(3) PLAINTIFFS' RENEWED MOTION FOR DEFAULT JUDGMENT AS TO EDWARD
ANTHONY SMITH, E. ANTHONY AND ASSOCIATES, LLC., THE EDIFUS GROUP,
INC., AND FOR MORTGAGES (DOCKET NO. 99)**

---

**MICHAEL J. WATANABE
United States Magistrate Judge**

      This matter came on for hearing on May 12, 2006, on:  (1) Plaintiffs' Motion for

Default Judgment as to Defendant William Bowman (docket no. 69); (2) Plaintiffs'

Application for Default Judgment Against Defendant William Bowman (docket no. 98);

and (3) Plaintiffs' Renewed Motion for Default Judgment as to Edward Anthony Smith,

E. Anthony and Associates, LLC, The Edifus Group, Inc., and For Mortgages (docket

no. 99).  The Plaintiffs Christophe McCray and Pensal McCray were present with

counsel Anne T. Sulton.  The Defendants Edward Anthony Smith, E. Anthony and

Associates, LLC, The Edifus Group, Inc., For Mortgages, and William Bowman were

not present.

The court has considered the testimony and credibility of Thomas A. Mills,

Christophe McCray, and Pensal McCray.  In addition, the court has considered

Plaintiffs' exhibits 1 through 15, inclusive.  Furthermore, the court has taken judicial

notice of the court's file and has considered applicable Federal Rules of Civil

Procedure and case law.  The court has further considered Plaintiffs' Status Report -

May 25, 2006 (docket no. 125), Plaintiffs' counsel, Anne T. Sulton's Affidavit of

Attorneys Fees (docket no. 123), and the Plaintiffs' Supplement to Motions for Default

Judgment (docket no. 130).   Finally, the court has considered oral argument presented

by Plaintiffs.  The court now being fully informed makes the following findings of fact,

conclusions of law, and recommendation.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Based upon the foregoing and the evidence presented, I find by a

preponderance of the evidence as follows:

1.      That this court has jurisdiction over the subject matter and over the

parties to this lawsuit.

2.      That venue is proper in the state and District of Colorado.

3.      That each party has been given a fair and adequate opportunity to be

heard.

4.     That Defendants Edward Anthony Smith, E. Anthony and Associates, LLC, The Edifus Group, Inc., and William Bowman have been given adequate notice of this hearing, but all of these Defendants have failed to appear for this Fed. R. Civ. P. 55(a) hearing.

5.     That Defendants Edward Anthony Smith, E. Anthony and Associates, LLC, and The Edifus Group, Inc., were properly served with a copy of the Summons and Complaint on January 13, 2006.  <u>See</u> docket nos. 17, 18, and 19.

6.     That Defendant William Bowman was properly served with a copy of the Summons and Complaint on February 19, 2006.  <u>See</u> docket no. 47, Plaintiffs' exhibits 1 and 2, and the testimony of Thomas A. Mills, process server.  That the Clerk of Court has entered a Clerk's default against Defendant William Bowman, on March 16, 2006.  <u>See</u> docket no. 71.

7.     That on March 2, 2006, I conducted a Rule 16 Scheduling Conference (docket no. 54).  Pro Se Defendant Edward Anthony Smith appeared at the Rule 16 Scheduling Conference by telephone since he was incarcerated in the Denver County Jail.  During this hearing, Mr. Smith indicated, on the record,  that he was the "registered person and owner of E. Anthony and Associates LLC and The Edifus Group, Inc."  On the record, I informed Mr. Smith that he could not represent the Co-Defendants E. Anthony and Associates LLC and The Edifus Group, Inc. since he was not a licensed attorney in good standing with this court.

4

Moreover, I informed Mr. Smith that he would have to retain an attorney to represent these two Co-Defendants.

8. That during this Rule 16 Scheduling Conference, I was informed by Pro Se Defendant Smith that he would be getting released from custody shortly. Accordingly, during this Rule 16 Scheduling Conference, I set Pro Se Defendant Smith's deposition for March 10, 2006, since he would be released from custody prior to March 10, 2006. See record of court proceedings before Magistrate Judge Watanabe for March 2, 2006, and minutes from that hearing.

9. That Defendant Edward Anthony Smith accepted service of process for himself and on behalf of Co-Defendants E. Anthony and Associates LLC and The Edifus Group, Inc., on January 13, 2006. See docket nos. 17, 18, and 19.

10. That I issued a written Recommendation dated March 14, 2006, on: (1) Plaintiffs' Motion for Default Judgment Against Defendants E. Anthony and Associates LLC, The Edifus Group, Inc., and For Mortgages (docket no. 28), and (2) Plaintiffs' Amended Motion for Default Judgment Against Defendant Edward Anthony Smith (docket no. 43). See docket no. 67. In paragraphs 3 and 4 on page 4 of my Recommendation (docket no. 67), I recommended to Judge Krieger the following:

   3. That Plaintiffs' Amended Motion for Default Judgment Against

Defendant Edward Anthony Smith (docket no. 43) be DENIED

WITHOUT PREJUDICE.  That Pro Se Defendant Smith be given

up to and including April 21, 2006, to file his Answer to the

Complaint, with a warning that failure by Pro Se Defendant Smith

to file a timely Answer to Plaintiffs' Complaint may result in default

being entered against Pro Se Defendant Smith.

4. That Defendants E. Anthony and Associates LLC and The

Edifus Group, Inc., be directed to forthwith retain legal counsel and

file their Answers to the Complaint on or before April 21, 2006, with

a warning that failure by Defendants E. Anthony and Associates

LLC or The Edifus Group, Inc., to timely file an Answer to the

Complaint may result in default being entered against Defendants

E. Anthony and Associates LLC or The Edifus Group, Inc.

11.    That on April 27, 2006, Judge Krieger entered her Order Construing

Recommendation of Magistrate Judge as an Order (docket no. 109).  In

her Order, she adopted my recommendation (docket no. 67) and made it

an Order of Court.

12.    That as of April 21, 2006, Defendants Edward Anthony Smith, E. Anthony

and Associates LLC, and The Edifus Group, Inc., have not filed an

Answer to the Complaint or otherwise defended and therefore all three (3)

of these Defendants are in default.

13.    That Defendants Edward Anthony Smith, E. Anthony and Associates,

LLC, The Edifus Group, Inc., and William Bowman are not infants, incompetent, or in the military service of the United States.

14. That Defendants Edward Anthony Smith, E. Anthony and Associates, LLC, The Edifus Group, Inc., and William Bowman have all failed to Answer or otherwise respond to the Plaintiffs' Complaint, and therefore these Defendants have admitted the factual allegations in Plaintiffs' Complaint.  See, e.g., Burlington Northern R.R. Co. v. Huddleston, 94 F.3d 1413, 1415 (10th Cir. 1996).

15. That Defendant For Mortgages has previously settled with Plaintiffs, and therefore Plaintiffs are not seeking default judgment against Defendant For Mortgages.  See docket nos. 110 and 122.

16. That Defendants John Liese, Home Loans Direct, MiStar Financial, Jaguar Group, and Cougar and Associates have previously settled with Plaintiffs.  See docket nos. 110, 111, and 112.

17. That during the period of May through July, 2004, Defendant Bowman, who was a long-time friend and fraternity brother of Plaintiff Dr. McCray, contacted Plaintiff Dr. McCray about a business investment.  This business investment required Plaintiff Dr. McCray to refinance his home and to provide some money from the proceeds at closing to Defendants Bowman and Smith.  Defendants Bowman and Smith would then agree to pay Plaintiff Dr. McCray's home mortgage payments for ten years, and at the end of ten years the Plaintiffs' home would be paid in full.  Plaintiff Dr.

McCray considered this business investment but did not act upon it immediately.  However, in August 2004, Plaintiff Dr. McCray decided to act upon this business investment opportunity, and he completed a loan application for Defendant Bowman.  Plaintiff Dr. McCray signed and executed this loan application in his office on September 24, 2004.  On that same day, Defendant Bowman took this loan application to Plaintiff Dr. McCray's home where his wife, the Co-Plaintiff Pensal McCray, also signed and executed this loan application. See Plaintiffs' exhibit 3.

18.     That Defendant Bowman told Plaintiff Dr. McCray that he would be working with Defendant Smith on this business investment and that Defendant Smith was a minister from God.

19.     That on October 28, 2004, both Plaintiffs Dr. McCray and Pensal McCray signed an Equity Share Agreement.  See Plaintiffs' exhibits 4 and 8. Plaintiffs Dr. McCray's and Pensal McCray's understanding of the Equity Share Agreement was that they would give to Defendants Bowman and Smith some money from the proceeds of the refinancing of their home, Defendants Bowman and Smith would pay their mortgage payments on their home for ten years, and at the end of ten years the Plaintiffs would get a deed to their home free and clear of any mortgage.

20.     That on September 24, 2004, Defendant Bowman also gave to Plaintiff Dr. McCray a Truth-In-Lending Disclosure Statement.  See Plaintiffs' exhibit 5.  Plaintiff Dr. McCray was told by Defendant Bowman not to

worry about signing this document and that is was needed.  Furthermore,

Defendant Bowman stated that he and Defendant Smith would take care

of it for him.

21.  That sometime after September 24, 2004, Defendant Bowman left a hand-

written document at Plaintiff Dr. McCray's office.  This hand-written

document informed Plaintiff Dr. McCray that the date of the closing on his

home for the loan was on October 25, 2004, at 1:00 p.m. This hand-

written document by Defendant Bowman also provided to Plaintiff Dr.

McCray directions to the location where the closing would take place.

See Plaintiffs' exhibit 6.

22.  That at the closing on October 25, 2004, Plaintiffs Dr. McCray and Pensal

McCray were not given time to review the closing documents, and they

just signed them on the advice of Defendant Bowman.  Defendant

Bowman told Plaintiffs Dr. McCray and Pensal McCray to sign the closing

documents and not to worry.  However, the closing documents that

Plaintiffs Dr. McCray and Pensal McCray signed at the closing were

different than those closing documents that were previously shown to

Plaintiffs Dr. McCray and Pensal McCray by Defendant Bowman.

23.  That following the closing, Defendants Bowman and Smith did not pay the

new mortgage payments for Plaintiffs Dr. McCray and Pensal McCray as

both Plaintiffs believed would be done.  As a result of non-payments, the

mortgage company, Co-Defendant Cougar Associates, a Colorado LLC,

contacted Plaintiff Dr. McCray by letter dated January 22, 2005, and told him that he owed them approximately $10,000 for unpaid mortgage payments. In particular, the letter states, in pertinent part: **"The amount now due and payable by February 21, 2005 is $10, 624.97.  This represents three (3) months of regular payments, December, January, and February at $2,164.82 = $6,494.46, accrued late charges from December 1, 2004 - February 1, 2005 at $108.24/month = $324.72; plus default interest of $3,805.79."**   See Plaintiffs' exhibit 9. Upon receipt of this letter, Plaintiff Dr. McCray contacted Co-Defendant Cougar Associates, LLC, to try and find out why Defendants Bowman and Smith had not made the mortgage payments as promised.  See Plaintiffs' exhibit 7 which are notes of the telephone conversations between Co-Defendant Cougar Associates, LLC, and Plaintiff Dr. McCray.  Thereafter, Plaintiff Dr. McCray contacted Defendant Smith.  Defendant Smith told Plaintiff Dr. McCray that he was going to pay the approximately $10,000. However, Defendants Bowman and Smith did not pay Plaintiffs' mortgage payments as promised.  Consequently, Plaintiffs' home went into foreclosure.

24.	That on January 4, 2006, Co-Defendant Cougar Associates, LLC, obtained the Public Trustee's Certificate of Purchase (Public Trustee Sale No. 7658) on the residence of Plaintiffs Dr. McCray and Pensal McCray located at 2937 South Ulster Street, Denver, Colorado 80231, the subject

10

property in this case.  At the sale, Co-Defendant Cougar Associates, LLC,

bid $303,361.77 on the subject property in this case.

25.  That on March 10, 2006, the deposition of Defendant Edward Anthony

Smith was taken.  <u>See</u> Plaintiffs' exhibit 15.  Defendant Smith was asked

the following questions and provided the following responses to such

questions:

Q    Okay, Tell me what the Equity Share Agreement is that you had –

that you presented to the McCrays.


A.   The Equity Share Agreement was actually an agreement that they

were going to loan me – loan me a sum of money.  And as a

payment back to the McCrays for that, we had made an agreement

that from the – from that particular agreement I had agreed with

them that I would help or assist in paying their mortgage for the

next ten years.

Q    And did you do that?

A    I did not.

<u>See</u> page 14 lines 7 - 18, in Plaintiffs' exhibit 15.


Q    Was William Bowman working with you as it relates to the deal you

offered to the McCrays?

A    I wouldn't say that he was working with me.  He did introduce me to

11

the McCrays.

<u>See</u> page 23 lines 14 - 17, in Plaintiffs' exhibit 15.


Q      Did you ever tell the McCrays that you were going to invest money

       in a Texas oil deal?

A      Yes, I did.

Q      Did you ever invest the money that they gave you – the $9,600 that

       they gave you–did you invest that in a Texas oil deal?

A      No, I didn't.

Q      Where did you put that money?


A      Actually, in the bank.

Q      Is it still in the bank?

A      No, it isn't.

Q      Where is it now?

A.     I don't know.

<u>See</u> page 27 lines 11 - 23, in Plaintiffs' exhibit 15.


Q      Okay.  Why did they give you $9,600?

A      Because it was loan in reference to the Equity Share Program.  It

       was not money for investment, it wasn't money that they were

       investing in anything, it was a personal loan from them to E.

12

Anthony and Associates.  All I did was call it an Equity Share Agreement.

Q	Okay, So they gave you a loan and they expected what to happen after they gave you a $9,600 loan?

A	Well, actually, they expected for – they did expect that we would make their mortgage payments.  However, there were other circumstances involved in this other than the $9,000.

<u>See</u> page 28 lines 5 - 18, in Plaintiffs' exhibit 15.


Q	Okay.  And what did you do with the money?

A	Again, I don't know exactly what happened to the money.  I'm sure the money was spent, but I don't know on what.


Q	But it's fair to say it wasn't spent to pay any amount on the McCray's mortgage, correct?

A	That's correct.

Q	Have you repaid the loan to the McCrays in any other way?

A	No.

<u>See</u> page 29 lines 10 - 18, in Plaintiffs' exhibit 15.


Q	Okay.  So after you made the introduction between John Liese and the McCrays, you were aware of the fact that the McCrays were

13

working with John Liese to get their Chase mortgage refinanced, correct?

A    That's correct.

Q    And you made calls to John Liese to inquire about the progress of the McCray's application for refinancing, correct?

A    That's fair to say, yes.

Q    Okay.  At some point you presented to the McCrays an Equity Share Agreement that included in it information about the loan and the loan payments that were to be made to Mistar or Home Loans, correct?

A    Yes.

See page 37 lines 4 -13 and lines 21 - 25, in Plaintiffs' exhibit 15.


Q    Did you ever visit the McCray's home with Bill Bowman?


A    Yes.

Q    And how many times did you do that?

A    I would say probably about three or four.

Q    Why did you make three or four visits with Bill Bowman to the McCray's home?

A    Well, first of all, Bill Bowman is a friend of the McCrays.  I went there– he introduced me to the McCrays at their home.

14

<u>See</u> page 39 lines 1 -10, in Plaintiffs' exhibit 15.


Q      Okay.  What did you tell Dr. McCray and the mortgage company

       during that conversation in January 2005 about what you were

       going to do to ensure that the mortgage company received Dr.

       McCray's mortgage payment?

A      Okay.  I did tell them that I would be more than happy to make the

       payments that were behind on the — on the mortgage....

<u>See</u> page 42 lines 6 -13, in Plaintiffs' exhibit 15.


Q      So you told the McCrays that you would make their mortgage

       payments, correct?

A      That is correct.

Q      And you understood when you told them that that [sic] if you did not

       pay the mortgage, the mortgage payments would be in default,

       correct?


A      That is correct.

Q      So you knew when you talked on that three-way conversation with

       Dr. McCray and the mortgage company in January 2005, you knew

       that their mortgage was in default, correct?

A      Yes, that is correct.

15

Q       Because you had not made any payments on their mortgage,

        correct?

A       That is correct.

Q       And you told the mortgage company and Dr. McCray that you

        would make a payment to bring that mortgage current, correct?

A       That is correct, yes.

See page 44 lines 7 -25, in Plaintiffs' exhibit 15.


Q       Why did you not make the payment?

A       I don't remember.

See page 46 lines 23 -25, in Plaintiffs' exhibit 15.


Q       Why did the McCrays agree to give you part of the proceeds from

        the refinancing of their home in the amount of $9,600?

A       Because we had discussed borrowing money from them as a loan

        to start an Equity Share Program.

See page 55 lines 17 -21, in Plaintiffs' exhibit 15.


Q       So at no point did you ask them to fill out a loan application or a

        financial statement?

A       That is correct.

See page 56 lines 8 -9, in Plaintiffs' exhibit 15.

Q       So you're denying that you told Dr. McCray that the money, the

        $9,600 they gave you, would be used to develop oil fields in

        Texas?

A       No, I'm not denying that.

<u>See</u> page 57 lines 2 -4, in Plaintiffs' exhibit 15.


Q       Okay.  So the meeting dates and times were told to you by Dr.

        Bowman?

A       A couple of times by Dr. Bowman and once by Dr. McCray, yes.

<u>See</u> page 59 lines 4 -7, in Plaintiffs' exhibit 15.


Q       Did you have Dr. McCray sign any documents to begin the

        mortgage loan refinancing process?

A       No, I did not.

Q       So any documents that Dr. McCray signed in September of 2004,

        you weren't involved in those documents in any way?

A       That's correct.

<u>See</u> page 59 lines 17 -23, in Plaintiffs' exhibit 15.


Q       Have you ever seen that document before? *[referring to deposition*

        *exhibit 2 and Plaintiffs' hearing exhibit 6]*

A       Yes.

17

Q      And on it it identifies William Bowman Marketing.  When did you

       first see this document?

A      This is a part of the template for business cards that I had for E.

       Anthony and Associates.

Q      And you knew that Dr. Bowman was using this business card?

A      Yes.

See page 70 lines 2 -11, in Plaintiffs' exhibit 15.


Q      Do you see Christophe McCray's signature on there with a date of

       9/24/04? *[referring to deposition exhibit 4 and Plaintiffs' hearing*

       *exhibit 5]*

A      I do.

Q      Is it your testimony that you did not present this document to Dr.

       McCray?

A      That is correct.

Q      Who did?

A      I don't know.  There is a possibility that Bill Bowman may have, but

       I didn't.

See page 72 lines 8 -16, in Plaintiffs' exhibit 15.


Q      Okay.  Let me draw your attention to page No. 7.  You see there

       that it's a Uniform Residential Loan Application, correct, at page 7?

18

A       Yes.

Q       Is this a document that you prepared?

A       No, it isn't.

Q       Who would have given this document to the McCrays?

A       Probably Dr. Bowman.

See page 74 lines 10 -18, in Plaintiffs' exhibit 15.


Q       And who would have given this document to Dr. McCray if you

        didn't?

A       Probably Dr. Bowman.

See page 76 lines 2 -4, in Plaintiffs' exhibit 15.


Q       You're saying you did not prepare this page 14?

A       That is correct.

Q       And it's your understanding that Dr. Bowman prepared it?

A       Yes

Q       Who would have prepared this document if you didn't?

A       Probably Dr. Bowman.

See page 78 lines 5 -9 and 22 - 24, in Plaintiffs' exhibit 15.


Q       And at page 17 you see Dr. McCray's signature at the bottom, but

        the entire page is not filled in other than having his and his wife's

19

name.  Do you see that?

A   I see her name on the top, but not a signature.

Q   All right.  But Dr. McCray's signature appears?

A   Yes.

Q   And you didn't prepare this document, you believe Dr. Bowman

did?

A   Yes.

Q   And look at page 18.

A   Un-huh.  Okay.

Q   Do you see Dr. McCray's signature and the date of 9/23/04?  Is this

document that would have been presented to Dr. McCray by Dr.

Bowman?

A   Yes.

Q   And the same with page No. 19?

A   Yes.

Q   And what about page 20?

A   I believe the same.

See page 79 lines 4-25, in Plaintiffs' exhibit 15.


Q   Did you give all 39 pages of the Equity Share Agreement to Dr.

McCray or Mrs. McCray?

20

A        I did.

<u>See</u> page 81 lines 2-4, in Plaintiffs' exhibit 15.


Q        Okay.  Let's go to the next paragraph where it says "Making of

Payments."  It says, "Each payment by borrower hereunder or

under the note shall be made in funds settled through the Financial

Clearing House Interbank Payment System or other wired

transferred funds immediately available to United Escrow &

Financial Services, Inc., by 2:00 p.m. Colorado time two days prior

to the date of such payment is due to lender Home Loans Direct,

LLC, 9800 Mt. Pyramid Court, Suite 400, Englewood, Colorado,

80112, amount 2,164.82, monthly mortgage loan No. 1008, to start

12/01/2004 ending 12/01/2014."  Do you see that?

A        I do.

Q        Okay.  What is the "Financial Clearing House Interbank Payment

System"?

A        I believe that was a wiring system in which- that banks used to wire

money.

Q        And so who was going to wire the money through that system?

A        Whatever bank that we set up to do that with.

Q        Okay.  And it's your understanding, based on this paragraph, that

you as the borrower were going to send money through this

"Financial Clearing House Interbank Payment System" to somehow

reach Home Loans Direct, correct?

A    That's correct.

Q    To make the McCray's monthly mortgage payment of $2,164.82,

correct?

A    That is correct.

Q    And you were going to do that for ten years?

A    That is correct.

Q    And you never made one payment, correct?

A    That's correct.

<u>See</u> page 92 lines 14-25, and page 93 line 1-25, in Plaintiffs' exhibit 15.


Q    Did you make payments on the McCray's mortgage?

A    No.  I did not.

<u>See</u> page 95 lines 15-17, in Plaintiff's exhibit 15.


26.   That on March 28, 2006, Co-Defendant Cougar Associates, LLC, filed a

Complaint in Unlawful Detainer in the County Court, County of Denver,

State of Colorado, under case no. 06 C07492 against Plaintiffs Dr.

McCray and Pensal McCray concerning their home located at 2937 South

Ulster Street, Denver, Colorado 80231 (the subject real property in this

case).  <u>See</u> Plaintiffs' exhibit 12.

27.    That on March 22, 2006, Co-Defendant Cougar Associates, LLC, served

the Plaintiffs Dr. McCray and Pensal McCray with a Three-Day Notice to

Vacate Real Property in case no. 06 C07492.  See Plaintiffs' exhibit 11.

The Notice required Plaintiffs Dr. McCray and Pensal McCray to vacate

the premises within three days.

28.    That on April 13, 2006, the 2005 Denver County Statutory Grand Jury

indicted Defendant Ed Tony Smith a/k/a Edward Anthony Smith.  The

Indictment charges Defendant Smith as follows: [1] in count one with

Securities Fraud - Untrue Statement or Omission a class three felony in

violation of §§ 11-51-501(1)(b) and 11-51-603(1), C.R.S.; [2] in count two

with Theft a class four felony in violation of § 18-4-401(1)(a)(b), (2)(c),

C.R.S.; and, [3] in count three with Theft - At Risk Victim a class three

felony in violation of §§ 18-6.5-103(5) and 18-4-401(1), C.R.S.  The

victims alleged in each of these three counts are Plaintiffs Dr. McCray and

Pensal McCray.   See Plaintiffs' exhibit 14.

29.    That Plaintiffs' home is no longer in foreclosure.  Plaintiffs were in the

process of refinancing their home at the time of this Fed. R. Civ. P. 55(a)

hearing.   See testimony of Plaintiffs Dr. McCray and Pensal McCray.

30.    That Plaintiffs gave to Defendant Smith $9,600.00.  Defendant Smith has

not refunded the $9,600.00 to Plaintiffs.  See testimony of Plaintiff Dr.

McCray and Defendant Smith deposition transcript (Plaintiffs' exhibit 15).

31.    That once the Plaintiffs closed on their new home loan in May 2006, such

23

new loan would retire the loan in question in this litigation.  See testimony

of Plaintiff Dr. McCray.

32.     That on May 25, 2006, per this court's order of May 12, 2006, the Plaintiffs

provided this court with a written status report captioned "Plaintiffs' Status

Report - May 25, 2006" (docket no. 125).  The status report states, in

pertinent part:

> Per the Court's Order of May 12, 2006, requiring a status report,
>
> please be advised plaintiffs closed on the new loan on May 25,
>
> 2006.  Couger was paid $250,000 and released the deed to
>
> plaintiffs.
>
>
> On May 23, 2006, plaintiffs received $3,000 of the funds promised
>
> by John Liese.

33.     That Plaintiffs do not have a private civil cause of action under 12 U.S.C. §

2604(c) of the Real Estate Settlement Procedures Act ("RESPA") .  See

Collins v. FMHA-USDA, 105 F.3d 1366 (11th Cir. 1997); Reese v. 1st

Metropolitan Mortgage Co., 2003 WL 2245658 (D. Kan. Oct. 28, 2003).

Accordingly, Plaintiffs' claim under RESPA should be dismissed.

34.     That § 18-4-405, C.R.S., Rights in Stolen Property states:

> All property obtained by theft, robbery, or burglary shall be
> restored to the owner, and no sale, whether in good faith on
> the part of the purchaser or not, shall divest the owner of his
> right to such property.  The owner may maintain an action not
> only against the taker thereof but also any person in whose

possession he finds the property.  In any such action, the owner may recover two hundred dollars or three times the amount of the actual damages sustained by him, whichever is greater, and may also recover costs of the action and reasonable attorney fees; but monetary damages and attorney fees shall not be recoverable from a good-faith purchaser or good-faith holder of the property.

35.   That in <u>Ziegler v. Inabata of Am., Inc.</u>, 316 F. Supp.2d 908 (D.Colo. 2004),

Judge Kane found that

civil theft is defined by the criminal code in section 18-4-405, titled the Rights in Stolen Property Statute.  <u>See Itin v. Ungar</u>, 17 P.3d 129, 133 (Colo. 2000).  The Colorado Supreme Court held a defendant is subject to liability under this "civil theft" statute if the trier of fact determined the defendant committed acts of theft, as defined by the Criminal Code.  <u>Id</u>. at 135.  The court further held a defendant can be found liable under the statute based on proof of a criminal act, but absent a prior criminal conviction. <u>Id.</u> at 133.  According to the court, the statute provides a private civil remedy; thus the court found it inconsistent to compel the defendant to be convicted of a crime.  <u>Id</u>. at 133-34.

. . . The <u>Itin</u> court found,

Placement within the Criminal Code requires that the owner of the property must prove that the taker or the defendant committed acts constituting at least one of the statutory crimes.  With respect to the crime of theft claimed here, all of its statutory elements must be proved, including the two culpable mental states: (1) that the defendant knowingly obtained control over the owner's property without authorization and (2) that he or she did so with the specific intent to permanently deprive the

25

owner of the benefit of property.

> Itin, 17 P.3d at 134 (citing § 18-4-401(1)). Colorado courts have construed this statute to mean that return of the property does not necessarily preclude a finding of wrongful intent nor purge the defendant of guilt.  People v. American Health Care, Inc., 42 Colo. App. 209, 591 P.2d 1343, 1345 (1979)(citing Kelley v. People, 166 Colo. 322, 443 P.2d 734 (1968)).

Id. at 916.

Here, I find and conclude that Plaintiffs Dr. McCray and Pensal McCray

have meet their burden on proof on their cause of action for civil theft.

36.   That to establish a private claim under the Colorado Consumer Protection

Act ("CCPA"), the plaintiff must show:

1)   The defendant engaged in an unfair or deceptive trade practice as

defined in Colorado Revised Statutes, Section 6-1-105(1);

2)   The challenged practice occurred in the course of the defendant's

business, vocation, or occupation;

3)   The challenged practice significantly impacts the public as actual or

potential consumers of the defendant's goods, services, or property;

4)   The plaintiff suffered injury in fact to a legally protected interest;

and,

5)   The challenged practice caused the plaintiff's injury.

See Rhino Linings USA, Inc., v. Rocky Mountain Rhino Lining, Inc., 62

P.3d 142, 146-47 (Colo. 2003).

37.     The CCPA is broadly construed, and in determining whether conduct falls

within the purview of the Act, it should ordinarily be assumed that the Act

applies.  The CCPA is also not limited in its application to conduct before

or at the time of the sale of goods, services, or property.  Showpiece

Homes Corp. v. Assurance Co. of Am., 38 P.3d 47 (Colo. 2001).

38.     Unfair trade practices are listed in § 6-1-105(a), C.R.S.  Under this statute,

a "person" has engaged in a deceptive trade practice when, in the course

of his or her business, vocation, or occupation, he or she commits any of a

long list of offenses.  The statutory list is non-exhaustive.  Many of the

enumerated prohibited practices involve providing false or misleading

representations with regard to the sale of goods or services.  Id.


The damages remedy of the Act provides that, except in a class action or a

case brought for violation of § 6-1-709, C.R.S. (concerning sales of

manufactured homes), a defendant who is found to have engaged in or

cause another to engage in a deceptive trade practice will be liable for:

actual damages, $500, or treble damages, whichever is greater.  See § 6-

1-113(2)(a), C.R.S.  Treble damages are available, however, only if it is

established by clear and convincing evidence that the defendant engaged

in bath faith conduct.  See § 6-1-113(2)(a)(III), C.R.S.  "Bad faith conduct"

is "fraudulent, willful, knowing, or intentional conduct that causes injury."  §

27

6-1-113(2.3), C.R.S.  The plaintiff may also seek punitive damages but may not be awarded both treble and punitive damages.  Quist v. Specialties Supply Co., 12 P.3d 863 (Colo. App. 2000); Lexton-Ancira Real Estate Fund 1972 v. Heller, 826 P.2d 819 (Colo. 1992).  In Colorado, punitive damage awards are governed by statute.  See § 13-21-102(1), C.R.S.   The statute provides that in a civil action in which damages are assessed by a jury for a wrong done to the person or to personal or real property and the injury is attended by fraud, malice, or willful and wanton conduct, the jury may award reasonable exemplary damages.  Miller v. Byrne, 916 P.2d 566 (Colo. App. 1995).  Exemplary damages may only be awarded when the party asserting the claim proves beyond a reasonable doubt the commission of a wrong under the circumstances set forth in the punitive damage statute.  See § 13-25-127(2), C.R.S.  Generally, the amount of exemplary damages cannot exceed the amount of actual damages awarded to the injured party.  See § 13-21-102(1)(a).  However, exemplary damages may be trebled if, while the action is pending, the defendant: (1) continues or repeats the behavior that is the subject of the claim in a willful and wanton manner; or (2) acts in a willful and wanton manner that further aggravates the plaintiff's damages when the defendant knows or should know that his or her action would produce aggravation. See § 13-21-102(3), C.R.S.

28

Lastly, a successful plaintiff may, under the CCPA, receive the costs of the action and reasonable attorney fees as determined by the court.  Dodds v. Frontier Chevrolet Sales & Serv., Inc., 676 P.2d 1237 (Colo. App. 1983). On the other hand, if a court concludes that an action brought under the CCPA is groundless and in bad faith or pursued for the purpose of harassment, the plaintiff is liable to the defendant for the costs of the action together with reasonable attorney fees as determined by the court. See § 6-1-113(3), C.R.S.

Here, I find and conclude that Plaintiffs Dr. McCray and Pensal McCray have met their burden of proof of their cause of action under the CCPA.  I further find, by clear and convincing evidence, that Defendants Bowman and Smith acted with "bad faith conduct" as defined in § 6-1-113 (2.3), C.R.S., in their business dealings with Plaintiffs Dr. McCray and Pensal McCray.

39.   That under the Truth in Lending Act ("TILA"), a borrower may rescind certain consumer credit transactions in which a security interest is or will be acquired in property which is used as the borrower's principal dwelling. See 15 U.S.C. § 1635(a).  Lenders must clearly and conspicuously disclose on a document separate from the other loan documents: (1) the retention or acquisition of a security interest in the borrower's principal dwelling, (2) the borrower's right to rescind the transaction, (3) how to

exercise the right to rescind, with a form for that purpose, designating the

address of the lender's place of business, (4) the effect of rescission, and

(5) the date the rescission period expires.  See 12 C.F.R. § 226.23(b)(1).


Here, I find and conclude that Plaintiffs Dr. McCray and Pensal McCray

have not met their burden of proof on their cause of action under the TILA

since Defendants Bowman and Smith are not lenders.

40.    To establish a prima facie case for fraud under Colorado law, plaintiff must

present evidence that: (1) defendant made false representation of material

fact; (2) defendant knew the representation was false; (3) plaintiff did not

know of the falsity; (4) the representation was made with intent that it be

acted on; and (5) the representation resulted in damages.  Bennett v.

Coors Brewing Co., 189 F.3d 1221, 1229-30 (10th Cir. 1999); Brody v.

Bock, 897 P.2d 769, 775-76 (Colo. 1995).


Here, I find and conclude that Plaintiffs Dr. McCray and Pensal McCray

have met their burden of proof of their cause of action for fraud.

41.    The measure of damages in an action for fraud by false representation is

actual damage, which may include the difference between the market

value of any property and what its value would have been had the

representation been true, and any other consequential damages sustained

as a proximate result of the false representation, concealment, or

nondisclosure.  T. A. Pelsue Co. v. Grand Enterprises, Inc., 782 F. Supp. 1476, 1488 (D. Colo. 1991).  Where the act occasioning injury was inspired by fraud or malice, mental suffering may be a proper element of damages.  McNeill v. Allen, 35 Colo. App. 317, 325, 534 P.2d 813 (1975).

42.     Plaintiffs Dr. McCray and Pensal McCray lost equity in their home by having to refinance their home a second time after being defrauded by Defendants Bowman and Smith through Defendants Bowman and Smith's bad faith conduct and deceptive trade practices.  The loss in equity was $48,000.00.  Furthermore, Plaintiffs Dr. McCray and Pensal McCray had to pay closing costs for both closings which totaled $11,200.00.  Plaintiffs Dr. McCray and Pensal McCray have not demonstrated any non-economic damages.  Lastly, Plaintiffs Dr. McCray and Pensal McCray were never refunded the $9,600.00 that was given to Defendants Bowman and Smith.

43.     That Defendants Bowman and Smith have caused actual damages to be incurred by Plaintiffs Dr. McCray and Pensal McCray in the amount of $68,800.00 ($48,000.00 + $11,200.00 + $9,600.00 = $68,800.00).  That the $68,800.00 in damages should be trebled pursuant § 6-1-113(2)(a)(III), C.R.S., since the evidence demonstrates, by clear and convincing evidence, that Defendants Bowman and Smith engaged in deceptive trades practices and bad faith conduct as defined in the CCPA.  Thus, $68,800.00 x 3 = $206,400.00.

44.     That Plaintiffs Dr. McCray and Pensal McCray are entitled to their

31

reasonable and necessary attorney fees under Civil Theft statute (§ 18-4-
405, C.R.S.) and under the CCPA and <u>Dodds</u>, *supra.*

45.     That the customary billing rate of $300 per hour by Plaintiff's counsel is
reasonable based upon her over 20 years of litigation experience and the
complexity of the issues before the court.  That the 49.2 billable hours
listed in Plaintiffs' counsel's affidavit are reasonable.  That total
reasonable and necessary attorney fees would thus be $14,760 ($300 x
49.2).

46.     That Plaintiffs Dr. McCray and Pensal McCray are the prevailing parties in
this case, and therefore they are entitled to be awarded their costs.

### RECOMMENDATION

**WHEREFORE**, for the forgoing reasons, it is hereby **RECOMMENDED**:

1.      That Plaintiffs' Motion for Default Judgment as to Defendant William
Bowman (docket no. 69) be **GRANTED IN PART AND DENIED IN PART**
as stated below.

2.      That Plaintiffs' Application for Default Judgment Against Defendant William
Bowman (docket no. 98) be **GRANTED IN PART AND DENIED IN PART**
as stated below.

3.      That Plaintiffs' Renewed Motion for Default Judgment as to Edward
Anthony Smith, E. Anthony and Associates, LLC, The Edifus Group, Inc.,
and For Mortgages (docket no. 99) be **GRANTED IN PART AND DENIED
IN PART** as stated below.

4.    That on Plaintiffs' RESPA and TILA claims, judgment be entered in favor of Defendants William Bowman, Edward Anthony Smith, E. Anthony and Associates, LLC, The Edifus Group, Inc., and against Plaintiffs Christophe McCray and Pensal McCray.

5.    That on Plaintiffs' Civil Theft, CCPA, and Fraud claims, judgment be entered in favor of Plaintiffs Christophe McCray and Pensal McCray and against Defendants William Bowman, Edward Anthony Smith, E. Anthony and Associates, LLC, The Edifus Group, Inc., jointly and severally, in the principal amount of $206,400.00, plus reasonable and necessary attorney fees in the amount of $14,760.00, plus pre-judgment interest from the date of the closing on October 25, 2004, plus post-judgment interest which should be accrued from the date of entry of default judgment entered by District Judge Marcia S. Krieger until the judgment is fully paid, pursuant to 28 U.S.C. § 1961, plus costs which should be taxed by the Clerk of Court consistent with D.C.COLO.LCiv.R 54.1.

**NOTICE:  Pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), the parties have ten (10) days after service of this recommendation to serve and file written, specific objections to the above recommendation with the District Judge assigned to the case.  The District Judge need not consider frivolous, conclusive, or general objections.  A party's failure to file and serve such written, specific objections waives *de novo* review of the recommendation by the District Judge, Fed. R. Civ. P. 72(b), Thomas v. Arn, 474 U.S. 140, 148-53 (1985), and also waives**

33

**appellate review of both factual and legal questions.  <u>Makin v. Colorado Dep't of Corrections</u>, 183 F.3d 1205, 1210 (10th Cir. 1999); <u>Talley v. Hesse</u>, 91 F.3d 1411, 1412-13 (10th Cir. 1996).**

Done this 5th day of July 2006.

BY THE COURT

<u>s/ Michael J. Watanabe</u>
Michael J. Watanabe
U.S. Magistrate Judge